divorce or separation, he may join both causes of action in his complaint. It has been held at Special Term that this section permits the defendant to join both causes of action in a counterclaim (Spahn v. Spahn, 12 Abb. N. C. 169); but, in so far as the defendant is permitted to join both these causes of action in his counterclaim, the practice rests solely upon the authority of section 1770, which refers only to counterclaims and has no application to complaints (Mason v. Mason, 34 Civ. Proc. R. 193, 94 N. Y. Supp. 868). It is difficult to see why the same practice which governs the joinder of causes of action in the counterclaim should not be extended to the complaint. The cases upon which Zorn v. Zorn, supra, rested were determined by considerations which would seem quite as applicable to counterclaims as to complaints. In those cases the courts stated that the cause of action for divorce prayed for a judgment dissolving the marriage contract, while the cause of action for separation contemplated the continued existence of the marriage contract. It seems, however, that this circumstance does not necessarily make the causes of action inconsistent, but rather shows that for the breach of the marriage contract two alternative remedies are demanded; one which will result in the dissolution of the contract, and the other which will result in its continuance with certain changes. Similarly, the cases upon which Zorn v. Zorn rested were largely determined by the manifest reluctance of the courts to subject the defendant to "an inquiry into the history of the domestic life of the parties to make out the charge of habitual cruelty or other indecent and outrageous conduct, and this, too, upon the mere contingency that such proof might be wanted if the other charge of adultery did not succeed." Johnson v. Johnson, 6 Johns. Ch. 163. See, also, Smith v. Smith, 4 Paige, 92; McIntosh v. McIntosh, 12 How. Prac. 289; Henry v. Henry, 17 Abb. Prac. 411; McNamara v. McNamara, 9 Abb. Prac. 18. This consideration, however, seems quite as applicable to complaints as to counterclaims. The reasoning of these cases above mentioned was questioned in a dictum in Doe v. Roe, 23 Hun, 19, 23; but this dictum was disregarded in Zorn v. Zorn, supra.

Although the rule of Zorn v. Zorn, supra, does not impress the court as being wholly satisfactory, it seems that that decision is controlling, and that the demurrer to the complaint herein must accordingly be sustained.

---

### SOBOL v. UNION RY. CO. OF NEW YORK.

(Supreme Court, Appellate Division, First Department. December 13, 1907.)

STREET RAILROADS—COLLISIONS WITH PEDESTRIANS—NEGLIGENCE—CONTRIBUTORY NEGLIGENCE.

    In an action for the death of a pedestrian struck by a street car, evidence *held* not to show decedent's freedom from contributory negligence, nor negligence of the company.

    Patterson, P. J., dissenting.

Appeal from Trial Term.

Action by Solomon Sobol, administrator of Joseph Sobol, deceased, against the Union Railway Company of New York. From a judgment

for plaintiff, and from an order denying a motion for a new trial, defendant appeals. Reversed, and new trial granted.

Argued before PATTERSON, P. J., and INGRAHAM, LAUGH-LIN, CLARKE, and SCOTT, JJ.

Bayard H. Ames, for appellant.

Frederick S. Martyn, for respondent.

LAUGHLIN, J. This is a statutory action to recover for the death of Joseph Sobol, alleged to have been caused by the negligence of the defendant. On the evening of the 14th day of July, 1904, at about half-past 7 o'clock, the decedent, who was 9 years and 5 weeks of age, was struck by a north-bound car of the defendant on Third avenue, between 155th and 156th streets, and sustained injuries which resulted in his death.

We are of opinion that the evidence is insufficient to sustain the verdict. It does not appear that the decedent exercised proper care for his own safety or that the motorman of the defendant was negligent. 155th street intersects Third avenue on the west, but does not cross it. The distance between 155th and 156th streets is 200 feet. The decedent resided with his parents at No. 3032 Third avenue, which is on the east side, nearly midway between 155th and 156th streets. He had attended school three or four years, and was a bright, careful boy, and had been for a long time accustomed to play in the street. The plaintiff called four eyewitnesses to the accident. Mr. Stedman, who was standing at the southwest corner of 156th street and Third avenue, testified that it was very light; that he saw the boy leaving the easterly curb in front of No. 3036, which would be two doors north of his residence, and run southerly toward the track; that he was "traveling not very fast, and on a little run"; that the north-bound car had then just passed 155th street, "going at a good rate of speed—I should say just a good rate of speed"—and he admitted that he testified before the coroner that the speed was 6 miles an hour; that he heard no bell until after the car struck the boy, but would not swear that it was not rung; that he should judge that the boy was about 15 feet from the car when he stepped on the track, and he admitted that he testified before the coroner that decedent stepped upon the track within 5 feet of the car; that he saw the motorman try to stop the car when 15 feet from the boy, or 15 to 20 feet from where the accident occurred, and had so testified before the coroner; that the car went about a car length and a half after striking the boy, and he admitted testifying on this point before the coroner that it only went about 15 feet after striking the boy. He also admitted that he made a statement in writing to the defendant as to how the accident occurred, and that in answer to the question, "Please give full account of the accident as witnessed by you," he had written:

"The boy ran from curb to car track. Motorman had no time to stop car, because it was so unexpected."

One Kimball, who resided on the east side of the avenue, opposite 155th street, testified that he was leaning out of his window upstairs, looking out on the avenue, and saw decedent about midway between

the curb and rail of the track, nearly in the middle of the block "on a little run"; that the car was then within 15 feet of decedent; that "the car seemed to be going a pretty good rate of speed," which he judged to be between 12 and 15 miles per hour, or the ordinary rate there; that the car was within 12 or 15 feet of the boy when he stepped on the track. This witness made a statement in writing to the company, in which he stated that there was no carelessness or neglect on the part of the conductor or motorman, so far as he knew; that the car was going at the medium rate of speed, and "struck a boy, who ran out from the curb directly in front of the car. The motorman applied brake, and stopped his car as quickly as he could. * * * As far as I know, the motorman was not to blame."

One Bokomy, who was standing at the northeast corner of Third avenue and 155th street, testified that he saw the boy about half way between the curb and the track in front of No. 3034 "going on a dog trot," and saw the car one-half a car length or a car length south of 155th street; that the car continued going very fast until the accident; that he heard no bell; that "when I saw him he was running a little bit fast to get by the car"; that when he saw the boy he noticed another boy running after him, but he could not say how far behind; and that the car passed between him and the boy, so that he did not see it strike the boy.

One Blake, who was standing at the southeast corner of 156th street and Third avenue, testified that he saw the decedent standing on the curbstone about 100 feet south of him, and run diagonally north from the curbstone towards 156th street, and that another boy was running after him, about 10 feet behind; that when he saw the boy running from the curbstone the car was about 75 or 100 feet from decedent and was coming quite fast; that the boy ran to the middle of the track, and turned around and tried to get off again, and was struck; that "the car was 20 feet away from him when he stepped into the track"; that the car was about 20 feet away from the boy when he was on the center of the track and turned; that he saw the motorman make no effort to stop the car until he was a few feet away from the boy, when he tried very hard to stop it; that the distance from the curb to the track was 10 feet, and the boy was about 2 feet on the track when he was struck; that it appeared to him that the car went about 75 feet while the boy was going 12.

The evidence introduced in behalf of the plaintiff does not indicate whether the boy saw the car, or made any effort to discover whether a car was approaching from either direction. It is unnecessary to review the evidence introduced in behalf of the defendant. It does not aid the plaintiff; for it tends to show that the boy ran into the side of the car, and did not get upon the track in front of it. It is clear that the plaintiff failed to sustain the burden devolving upon him of showing that the decedent was free from contributory negligence and that his death was due to the negligence of the defendant. The fact that a boy was following the decedent does not materially aid the plaintiff's case. There is nothing to indicate that the decedent was obliged to run across the track, and, as he led the way, it was incumbent upon him to pay some attention to his surroundings. But

for the testimony of Blake there would be no evidence tending to show that the motorman should have discovered the position of the boy in time to avoid injuring him, and it is inconsistent with the testimony of the other three witnesses called by plaintiff.

It follows that the judgment and order should be reversed, and a new trial granted, with costs to appellant to abide the event. All concur, except PATTERSON, P. J., who dissents.